Alex BROWN, Appellant,

v.

M STREET FIVE, LLC, Appellee.

Nos. 11–CV–103, 11–CV–152, 11–CV–607, 11–CV–834.

District of Columbia Court of Appeals.

Argued April 4, 2012.

Decided Dec. 6, 2012.

Robert C. Gill, with whom Shannon H. Rutngamlug and Justin Sadowsky, Washington, were on the brief for appellant.

Roger D. Luchs, with whom Richard W. Luchs and Gregory T. DuMont, Washington, were on the brief for appellee.

Before FISHER and BLACKBURNE–RIGSBY, Associate Judges, and KING, Senior Judge.

BLACKBURNE–RIGSBY, Associate Judge:

Following a bench trial, appellee M Street Five, LLC ("M Street Five") was granted possession of the commercial property located at 3213 M Street N.W., Washington, D.C. (the "Property"), on the basis that the lease extension agreement between the parties was void because appellant Alex Brown ("Brown") d/b/a Papillon Stores, Inc. ("Papillon"), lacked contractual capacity to enter into a lease extension agreement after Mary-

land revoked its corporate charter. On appeal, Brown argues that: (1) Papillon had capacity to contract despite the revocation of its corporate charter; (2) alternatively, Brown contends that M Street Five cannot challenge the validity of the lease extension agreement because it had knowledge of Papillon's corporate revocation since 2006 and considered Brown its actual tenant; and (3) if the lease extension was void, the trial court erred by awarding M Street Five attorney's fees pursuant to an attorney's fees provision incorporated by reference in the lease extension agreement. Additionally, Brown contends for the first time on appeal that the judgment granting possession of the property to M Street Five was invalid because the notice to quit did not stipulate that Papillon's revoked corporate status was the basis for terminating the tenancy. We affirm the judgment granting possession of the property to M Street Five but reverse the judgment awarding attorney's fees to M Street Five.

## I.

On August 14, 1995, M Street Five executed an agreement to lease its property to Papillon for a term of five years. Although it had not yet incorporated, Papillon identified itself as "Papillon Stores, Inc.," and Brown executed the lease on its behalf. In April 2000, Papillon, identifying itself as a Maryland corporation, exercised its lease extension option (as provided in the original lease), which extended its lease of the Property until August 2005. Papillon incorporated in Maryland on August 22, 2000, and subsequently, on September 22, 2000, obtained a certificate of authority to do business in the District of Columbia. However, due to the failure to file its Maryland tax returns, Papillon forfeited its Maryland incorporation charter on October 7, 2002. According to the record from the trial court, its articles of incorporation were never reinstated by Maryland.

Papillon and M Street Five entered a second five-year extension agreement (the "Second Extension Agreement") on August 12, 2004. The Second Extension Agreement, which is the crux of the dispute before us, granted Papillon an option to extend the lease for an additional five-year term. The District of Columbia revoked Papillon's certificate of authority to conduct business on September 13, 2004.[1] Nevertheless, Papillon continued to adhere to the terms of its lease with M Street Five. The parties entered into additional lease modification agreements on April 13, 2009 and March 1, 2010.[2] Both lease modification agreements listed "Papillon Stores, Inc." as the tenant and were signed by Brown on Papillon's behalf.

In January 2010, Brown attempted to exercise the option in the Second Extension Agreement to extend Papillon's lease of the property by another five years.[3]

---

**1.** On January 11, 2010, Brown incorporated a "Papillon Stores, Inc." ("Papillon DC") as a corporation in the District of Columbia, a distinct entity from the entity incorporated in Maryland in 2000. This is irrelevant to our analysis.

**2.** At trial, M Street Five attempted to introduce a lease modification agreement dated November 10, 2008, but Brown maintained that his signature was a forgery. The trial judge made no findings regarding the authen-

ticity of the document and it was not admitted into evidence. The November 10, 2008, lease modification agreement was, however, incorporated by reference into both the April 13, 2009, lease modification agreement and the March 1, 2010, lease modification agreement.

**3.** The parties dispute whether Brown properly exercised the option to extend the lease further. However, that issue is not before us in this appeal.

However, on June 15, 2010, M Street Five served Papillon with a 90–day notice to terminate the lease. When Papillon refused to leave the Property by M Street Five's September 30, 2010 deadline, M Street Five filed a suit for possession against Papillon in the Landlord and Tenant Division of the District of Columbia Superior Court. Papillon responded by filing a suit in the Civil Division of the Superior Court (2010 CA 008109), which was consolidated with M Street Five's suit for possession. M Street Five filed a motion for summary judgment three weeks prior to trial, raising for the first time, the issue that the Second Extension Agreement was void because Papillon's articles of incorporation had been revoked prior to Brown's signing of the Second Extension Agreement on behalf of Papillon. Therefore, M Street Five contended that without a corporate charter, Papillon was a legal non-entity without the ability to enter a contract, thereby rendering the Second Extension Agreement void ab initio. The trial court entered judgment in favor of M Street Five on December 13, 2010, concluding that the Second Extension Agreement was void because Papillon was not a valid corporation when it executed the Second Extension Agreement. In this judgment, the trial judge also granted M Street Five's oral motion to amend the complaint, such that Alex Brown, d/b/a Papillon Stores, Inc., replaced Papillon Stores, Inc., as the defendant in the trial proceedings.

Brown filed a motion to amend judgment, or alternatively, for a new trial, pursuant to Super. Ct. Civ. R. 59 and 60(b), claiming that a "recently discovered" letter, dated February 20, 2006, from M Street Five's counsel to Papillon proved that M Street Five had notice of Papillon's revoked corporate status, but continued to assent to the Extension Agreement. Brown alleged that M Street Five misrepresented its ignorance of this fact at trial, had treated Alex Brown as its tenant, and was therefore estopped from claiming that Papillon remained the legal tenant.[4] The trial court denied the motion, concluding that even if the court considered the letter and assumed M Street Five had notice of the revocation as early as 2006, Brown would still not be entitled to relief because Papillon had no legal capacity to enter into the 2004 Extension Agreement. The trial court subsequently granted M Street Five's request for attorney's fees pursuant to D.C.Code § 29–101.139 (2001), finding that the attorney's fees were liabilities that Brown incurred by assuming to act on behalf of a corporation, i.e. Papillon, without authority to do so, making Brown liable in his individual capacity. This appeal followed.

## II.

### A.

Brown relies upon two doctrines to support his argument that the trial court erred in finding that the lease was void ab initio because Papillon lacked legal capacity to contract under Maryland law in 2004:(1) Papillon was a de facto corporation when it executed the Second Extension Agreement; or (2) the doctrine of

4. At trial, Catherine Harrington, Director of leasing and marketing for Axent Realty Group, managing agent of the Property, testified that M Street Five was unaware of the revocation of Papillon's corporate charter until litigation began. Brown contends, however, that in a letter dated February 20, 2006, M Street Five's counsel informed Brown that it knew about the forfeiture and would hold Brown personally liable as the tenant under the lease. The February 20, 2006 letter is included with the record on appeal because Brown attached it to his Motion to Amend Judgment.

corporation by estoppel allows the court to enforce the Second Extension Agreement regardless of Papillon's actual legal status because M Street Five had recognized Papillon as a corporation and dealt with it as such, and was thereby estopped from claiming otherwise.[5]

■ "On appeal from a bench trial, we review the trial court's legal conclusions *de novo,* but defer to its factual findings if they are supported by the record." *Chibs v. Fisher,* 960 A.2d 588, 589 (D.C.2008) (citing D.C.Code § 17–305 (2001)). The trial court concluded as a matter of law that the Second Extension Agreement was void because both Maryland and the District of Columbia have statutes preventing a revoked corporation from conducting any business for purposes other than winding up the corporation. *See* D.C.Code § 29–101.123 (2001) (repealed 2011)[6] and MD. CODE ANN., CORPS. & ASS'NS §§ 3–503(d)

and –515(c)(4) (2007).[7] Further, in light of the punitive purpose of these statutes, the trial court refused to invoke an equitable remedy to prevent the eviction of Brown.

■ In the District of Columbia, the "substantive law governing the powers of a corporation derive from the state in which it is incorporated." *Behradrezaee v. Dashtara,* 910 A.2d 349, 356 (D.C.2006) (citation omitted); *see also* RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 299(1) (1971) ("Whether the existence of a corporation has been terminated or suspended is determined by the local law of the state of incorporation"). Because . Papillon was originally incorporated in Maryland, we look to Maryland's law. Consequently, the central issue in this appeal is whether Papillon, a lapsed Maryland corporation as of 2002, was able to enter into an enforceable contract under Maryland law when it executed the Second Extension Agreement

5. A de facto corporation is a defectively created corporation, resulting from a bona fide or good faith attempt to incorporate under statutory authority. *See* 8 Carol J. Jones, FLETCHER CYCLOPEDIA OF THE LAW OF CORPORATIONS § 3761 (William Meade Fletcher ed., 2010 revised ed.). Under this doctrine, a defective corporation that attempted in good faith to incorporate is treated like a de jure corporation for contract enforcement purposes except in a direct attack by the state questioning its corporate existence. *See id.* The corporation by estoppel doctrine furthers equitable principles, and in certain instances, prevents parties from voiding a contract even when the "corporation" failed to "colorably fulfill the statutory requirements[.]" *See id.* at § 3889. However, the doctrines of corporation by estoppel and de facto corporation have been routinely criticized for being ambiguous and causing conflicting opinions. *See id.* at §§ 3761, 3889. Therefore, many state statutes and the Model Business Corporation Act have expressly eliminated these doctrines. *See id.*

6. This statute, which was part of the "District of Columbia Business Corporation Act" re-

mained in force until its replacement, the "Business Organizations Code General Provisions Act of 2010" became effective on July 2, 2011. D.C.Code § 29–101.01 (2011). The D.C. Council included a "Savings Clause" when it replaced the Business Corporation Act. Namely, section 29–107.05 (2011) of the Business Organizations Code provides: "[t]he repeal of a law by this title shall not affect:

(1) The operation of the law or any action taken under it before its repeal;
(2) Any ratification, right, remedy, privilege, obligation, or liability acquired, accrued, or incurred under the statute before its repeal;
(3) Any violation of the law or any penalty, forfeiture, or punishment incurred because of the violation before its repeal; or
(4) Any proceeding, reorganization, or dissolution commenced under the law before its repeal, and the proceeding, reorganization, or dissolution may be completed in accordance with the statute as if it had not been repealed.

7. Because of the similarities between D.C. and Maryland's statutes, the trial court did not decide which state's law to apply.

in 2004.[8]

Brown argues that Papillon was a de facto corporation when it entered the Second Extension Agreement because it was validly organized but failed to comply with conditions subsequent to organization necessary to preserve its charter and that, as a de facto corporation, Papillon existed as a corporation de jure against all persons but the state. This argument fails to consider the Maryland statutory scheme governing corporations, which explicitly establishes that once the charter of a Maryland corporation has been forfeited, "the powers conferred by law on the corporations are inoperative, null, and void as of the date of the proclamation, without proceedings of any kind either at law or in equity." MD.CODE ANN., CORPS. & ASS'NS § 3–503(d) (2007). Furthermore, "the directors of the corporation become the trustees of its assets for purposes of liquidation" and their powers are restricted to actions necessary to "wind up" the corporation. MD.CODE ANN., CORPS. & ASS'NS § 3–515(c)(4) (2007); see also Dual Inc. v. Lockheed Martin Corp., 383 Md. 151, 857 A.2d 1095, 1102 (2004) ("[t]he powers granted to directors-trustees by § 3–515 clearly are intended only for the 'winding up' of a corporation's affairs."). Accordingly, when Papillon forfeited its corporate charter in 2002, its powers became "inoperative, null, and

void," and it acted without authority when it entered the 2004 Lease Extension, which was a new contract that was not related to winding up the corporation.

In its interpretation of the Maryland statutory scheme governing corporations, the Maryland Court of Special Appeals has emphasized that "[w]hen a corporation's charter is forfeited for non-payment of taxes or failure to file an annual report, the corporation is dissolved by operation of law and ceases to exist as a legal entity." Kroop & Kurland, P.A. v. Lambros, 118 Md.App. 651, 703 A.2d 1287, 1289 (1998); see also Dual Inc., supra, 857 A.2d at 1101 ("A corporation, the charter for which is forfeited, is a legal non-entity; all powers granted to Dual, Inc. by law, including the power to sue or be sued, were extinguished generally as of and during the forfeiture period."). Indeed, the Maryland Court of Appeals has addressed the issue presented by this case, finding that when a corporation has forfeited its charter, it loses the power to contract. Arnold Developer, Inc. v. Collins, 318 Md. 259, 567 A.2d 949, 953 (1990) (finding that while the corporation did lose its capacity to contract while its charter was forfeit, the subsequent reinstatement of its charter validated the act of executing the contract, pursuant to Maryland's revival statute, MD.CODE

8. As an initial matter, we recognize that if Papillon did exist as a valid Maryland corporation when it entered the Second Extension Agreement on August 12, 2004, the Second Extension Agreement would have been a valid contract pursuant to D.C.Code § 29–101.119 (2001). This provision states that:

> The failure of a foreign corporation to obtain a certificate of authority to transact business in the District shall not impair the validity of any contract or act of such corporation, and shall not prevent such corporation from defending any action at law or suit in equity in any court of the District.

The District of Columbia's statutory scheme contemplates that a valid foreign corporation

can in some circumstances still transact business in the District of Columbia even without a certificate of authority. See A. Tasker, Inc. v. Amsellem, 315 A.2d 178, 180 (D.C.1974) (upholding the validity of a contract executed by an existing foreign corporation that did not have valid certificate of authority to transact business in the District of Columbia). However, that is not the scenario presented to us in this appeal because, in addition to lacking a certificate of authority to transact business in the District of Columbia, Papillon was not a valid Maryland corporation at the time it entered the Second Extension Agreement.

ANN., CORPS. & ASS'NS § 3–512 (2007)).[9] These cases debunk Brown's theory that Papillon could act as a "de facto corporation" under Maryland law.[10] Rather, the case law confirms that when Papillon failed to pay its taxes, its corporate charter was forfeited by operation of law, and its power became limited to only activities related to "winding up" the corporation. MD.CODE ANN., CORPS. & ASS'NS § 3–515(c)(4) (2007). Therefore, we conclude that under Maryland's well-established statutory and case law, when Papillon forfeited its charter in 2002, it became a legal non-entity with no power to contract, thereby rendering the Second Extension Agreement of 2004 void ab initio.

In the alternative, Brown seeks an equitable remedy to prevent M Street Five from denying Papillon's capacity to contract. Namely, Brown urges the court to apply the doctrine of corporation by estoppel, which provides that if the opposing party has recognized Papillon's corporate status and has dealt with it as such, the opposing party "is now estopped to deny that [Papillon] is a corporation." *Namerdy v. Generalcar*, 217 A.2d 109, 112 (D.C.1966) (citing, inter alia, *Cranson, supra*, 200 A.2d at 33). Corporate estoppel "is generally employed where the person [or entity] seeking to hold the officer personally liable [for the acts of the corporation] has contracted or otherwise dealt with the [corporation] in such a manner as to recognize and in effect admit its existence as a corporate body." *Cranson, supra*, 200 A.2d at 34. Brown argues that M Street Five should be estopped from claiming that the 2004 Lease Extension was void ab initio because M Street Five recognized Papillon's corporate existence when it agreed to enter into the 2004 Lease Extension with Papillon. Also, M Street Five continued to modify its agreement with Papillon and accepted rental payments, despite having knowledge since 2006 of the revocation of Papillon's certificate of authority to do business in the District of Columbia. The trial judge, citing *Accurate Constr. Co. v. Washington*, 378 A.2d 681, 685 (D.C.1977), recognized that equitable remedies might be available under certain circumstances, such as for the sake of preventing a corporation from using a defect in incorporation to deny its own existence to the detriment of parties unaware of the corporate status. However, the trial judge declined to make an equitable exception in this case because "[t]his is not a case where it would be unreasonable to charge Papillon with responsibility," noting that Brown alleged no facts indicating a lack of sophistication or lack of notice of the forfeiture of Papillon's corporate charter.

The doctrine of corporation by estoppel is not appropriate under the circumstances of this case.[11] *Accurate* dealt with wheth-

---

9. MD.CODE ANN., CORPS. & ASS'NS § 3–512 (2007) provides in relevant part:

> The reinstatement and extension of a corporation's existence under § 3–501 of this subtitle or the revival of a corporation's charter under § 3–507 of this subtitle has the following effects:
> (1) If otherwise done within the scope of its charter, all contracts or other acts done in the name of the corporation while the charter was void are validated, and the corporation is liable for them.

10. Appellant cites to only one case in support of its de facto corporation theory: *Cranson v. Int'l Bus. Machs. Corp.*, 234 Md. 477, 200 A.2d 33 (1964), and makes no reference to the Maryland statutory scheme governing the existence of corporations. Even in *Cranson*, the Maryland Court of Appeals determined that it is "not at all clear what Maryland has done with respect to [the doctrine of corporation de facto and the doctrine of estoppel to deny the corporate existence]." *Id.* at 34.

11. In their appellate briefs, neither party indicates whether the availability of the doctrine

er a District of Columbia corporation whose articles of incorporation were revoked could enter an enforceable contract. 378 A.2d at 682. In *Accurate,* the court refused to enforce the contract, rejecting the corporation's argument that the reinstatement of the corporation, which occurred ten years after the corporation entered the contract, operated to validate its prior acts. *Id.* at 684. We found that allowing the retroactive validation of a corporation's prior acts through reinstatement of the articles of incorporation was "fundamentally at odds with the overall purpose and intent of [the District of Columbia's] statutory scheme," [12] emphasizing that:

> The purpose of revocation is obviously to prohibit a corporation from enjoying the privileges of that status when it has failed to perform its resultant responsibilities. Revocation is a disability imposed on a corporation as a penalty. It would deprive the statute of its force and encourage a corporation to default on paying its taxes and fees and filing its

annual reports if by subsequent compliance such a corporation could at its convenience completely erase the effects of the penalty.

*Id.* at 684–85; *see also Price v. Upper Chesapeake Health,* 192 Md.App. 695, 995 A.2d 1054, 1064 (2010) ("The evident purpose of these statutes is to penalize the corporation if it fails to comply with the revenue and regulatory acts, [that is], to coerce compliance by threat of this penalty should the corporation neglect or fail to obey the law.") (quoting *Castner v. First Nat'l Bank of Anchorage,* 278 F.2d 376, 382–83 (9th Cir.1960)). Thus, revocation of a corporate charter is intended to prevent the corporation from entering new contracts. Nevertheless, we recognized that there may "be cases where equitable considerations surface—as, for example, where it would be unreasonable to charge a corporation with responsibility for revocation of its charter, or where a corporation after revocation might be estopped to deny the validity of its undertakings when

---

of corporation by estoppel should be evaluated under Maryland or D.C. law. Whereas Maryland has applied this doctrine in *Cranson,* and as recently as 1996, has recognized that the doctrine remains in existence in *Hill v. County Concrete Co.,* 108 Md.App. 527, 672 A.2d 667, 672 (1996), it is unsettled whether D.C. law even recognizes the corporation by estoppel doctrine. *Compare Robertson v. Levy,* 197 A.2d 443, 446–47 (D.C.1964) (concluding that the inherent problems associated with the de facto and estoppel doctrines were eliminated by statute), and *Democratic Nat'l Comm. v. McCord,* 416 F.Supp. 505, 506 (D.D.C.1976) (concluding that unincorporated associations cannot invoke the corporation by estoppel doctrine to establish standing because the doctrine is not recognized in the District of Columbia), with *Namerdy, supra,* 217 A.2d at 112 (stating that a party, having recognized the corporate status of the opposing party and having dealt with it as such, admits the legal existence of the corporation for the purpose of any action that may be brought to enforce the contract and is es-

topped from denying the legality of the corporation's existence). Nevertheless, we need not reach the issue of whether the doctrine remains in force in the District of Columbia because, as will be discussed, Papillon has not proven facts that would support the application of the corporation by estoppel doctrine.

12. As the trial judge noted, the District's statute governing the revocation of articles of incorporation for failure to pay fees or file reports is strikingly similar to the provision codified by Maryland. Whereas Maryland's statute provides: "the powers conferred by law on the corporations are inoperative, null, and void as of the date of the proclamation, without proceedings of any kind either at law or in equity," MD.CODE ANN., CORPS. & ASS'NS § 3–503(d); the District's statute provides in relevant part that: "upon the issuance of such proclamation[,] the articles of incorporation ... shall be void and all powers thereunder without further proceedings of any kind." D.C.Code § 29–101.123(a) (2001).

dealing with parties unaware of the corporate status." *Accurate, supra,* 378 A.2d at 685. In *Truitt v. Miller,* for example, we applied the doctrine of corporation by estoppel because "[the corporation without valid articles of incorporation] held itself out to the Millers as a bona fide corporation and it should now be estopped from using its own failure to file annual reports as a way to evade responsibility for the obligations it appeared to assume." 407 A.2d 1073, 1081 (D.C.1979). Conversely, because the corporation in *Accurate* "purported to continue business for a period with full knowledge of the revocation, and thereafter made no effort to have its corporate powers restored until this litigation commenced," we concluded that an equitable remedy was not appropriate. *Accurate, supra,* 378 A.2d at 685.

Maryland also denies equitable relief under circumstances where the purported corporation continues to conduct business despite having knowledge that Maryland has revoked its articles of incorporation. In *Hill v. Cnty. Concrete Co., supra,* the court concluded that because appellant continued to operate under an incorporated name for years after he *knew* he could no longer do so, appellant's actions were not in good faith and thus the benefit of corporate estoppel was not applicable. 672 A.2d at 672; *cf. Cranson, supra,* 200 A.2d at 39 (holding that it would be inequitable to allow IBM to deny another corporation's existence after IBM had dealt with the corporation as such because the individual, who acted in good faith on behalf of the corporation was unaware of an oversight that delayed incorporation until after IBM executed the contract with the corporation). The case here is analogous to *Hill* and *Accurate* because Brown had notice that Maryland revoked Papillon's corporate charter in 2002 and that the District revoked its certificate of authority in 2004. Yet, Brown disregarded these facts and entered into the Second Extension Agreement and subsequent lease modification agreements with M Street Five on behalf of "Papillon Stores, Inc." The doctrine of corporation by estoppel should not be employed to alleviate the consequences of Papillon's forfeiture of its corporate charter, where Brown knowingly contracted after learning that Papillon's corporate charter lapsed and that Papillon had no certificate of authority to do business in the District of Columbia. To hold otherwise would undercut the purpose of both the District of Columbia and Maryland's statutes governing the revocation of corporate charters. *See Accurate, supra,* 378 A.2d at 685; *Price, supra,* 995 A.2d at 1064.

### B.

■ In addition to claiming corporation by estoppel to prevent M Street Five from denying Papillon's corporate existence, Brown raises another theory of estoppel in attempt to prevent M Street Five from challenging his right to exercise, in his individual capacity, the extension option in the Second Extension Agreement.[13] Es-

---

13. In his appellate briefs, Brown does not actually use the term "estoppel" to characterize the argument that "[i]f M Street knew about the revocation, but continued to allow Mr. Brown to stay in the premises in return for holding him (or his company, Alex Brown, Inc.) responsible for the Lease, then Mr. Brown would have a right of occupancy to the premises regardless of Papillon Stores, Inc.'s right." However, in his Motion to Amend Judgment, Brown argued that the trial court "did not have the benefit of the documents establishing that Plaintiff considered Mr. Brown individually, and not the defunct corporation, to be its tenant ... having represented to Mr. Brown that he, and not Papillon Stores, Inc., was thereafter to be the tenant, M Street 5 is estopped from claiming that Papillon Stores, Inc. remained the tenant and

sentially, this argument is two-pronged: (1) the trial court's finding that M Street Five was unaware that Papillon's charter had been revoked was clearly erroneous; and (2) that fact is relevant because if M Street Five did know that Papillon was a legal non-entity but continued to accept rent payments from Brown and held him personally liable under the terms of the Second Extension Agreement, "Brown can still enforce *his* contract with M Street Five for occupancy of the premises." That is, because M Street Five treated Brown as the tenant, M Street Five is estopped from claiming that Papillon, rather than Brown, is the tenant under the Second Extension Agreement. Therefore, Brown contends that our finding that Papillon was a legal non-entity would not affect the validity of the Second Extension Agreement.

In his Motion to Amend Judgment, Brown submitted "newly discovered evidence" in response to the trial court's finding that M Street Five did not know that Papillon's charter had been revoked until its lawyers initiated the litigation that led to this appeal. Brown relied heavily on Exhibit 1 to his motion, which was a signed letter dated February 20, 2006, from lawyers representing M Street Five to Papillon, "Alex Brown t/a Papillon Stores, Inc.," and "Tony Ramazani t/a Papillon Stores, Inc." [14] This letter stated that Papillon's corporate charter in Maryland and certificate of authority in the District of Columbia had both been revoked. The letter continued:

[a]s a result of the fact that there is no corporation under the name of "Papillon Stores, Inc." recognized by either the State of Maryland or the District of Columbia, Landlord shall hold Alex Brown, who signed the Lease on behalf of the nonexistent corporation, and Tony Ramazani, who operates business activity within the Premises along with Alex Brown, personally liable as the tenants under the Lease. As used herein, any reference to "Tenants" shall thus mean to Alex Brown and Tony Ramazani, collectively.

Brown asserts that this letter presented convincing evidence that, contrary to the trial judge's finding, M Street Five had been aware of Papillon's status for several years before initiating litigation to remove Alex Brown from the premises. The trial judge denied Brown's motion, finding that the attached documents were inadmissible because they did not constitute "newly discovered evidence," and that even if they were admissible, they would not warrant relief as a matter of law because the facts of this case would not justify an equitable exception to "to the statutory command that acts of entities that have lost their corporate status are void."

As noted above, we review the legal conclusions of the trial court *de novo. Chibs, supra,* 960 A.2d at 589. We conclude that M Street Five's alleged knowledge of Papillon's lapsed corporate status since 2006 was immaterial because it is insufficient to establish that Papillon existed as a corporation by estoppel.[15]

---

could not legally act to exercise the renewal option."

**14.** The other exhibits were: an unsigned and undated Mutual Release Agreement, an unsigned and undated Mutual General Release Agreement, a letter dated March 23, 2006, from counsel for M Street Five to counsel for Brown asking Brown to review the attached

release, and an insurance policy for the property in the name of "Alex Brown, Inc. DBA Riccardi Style."

**15.** *See,* discussion *supra* Part II.A. In light of our conclusions that the Second Extension Agreement was void ab initio because Papillon's corporate status had lapsed when it signed the agreement and that M Street Five

Further, M Street Five's knowledge of Papillon's lapsed corporate status fails to support appellant's alternative theory that M Street Five was estopped from claiming that Papillon, rather than Brown, was its tenant under the Second Extension Agreement. Notably, the April 2009 and March 2010 lease modification agreements, which were subsequent to the 2006 letter, both listed "Papillon Stores, Inc." as the tenant and were admitted at trial without objection. By referring to "Papillon Stores, Inc.," rather than "Alex Brown" as the "tenant," the lease modification agreements indicate that even if Brown's claim that he was the actual tenant when M Street issued the 2006 letter was accurate, this status had changed by the time the parties modified the lease in 2009 and 2010. Furthermore, the 2004 Second Extension Agreement at the heart of this dispute was never amended to replace Papillon Stores, Inc., with Brown as the tenant. Therefore, even if

M Street Five had intended to hold Brown personally liable as its tenant in 2006, the subsequent lease modification agreements in evidence establish that, in 2009 and 2010, both parties acted as if Papillon Stores, Inc., was the tenant. Accordingly, M Street Five is not estopped from arguing here that Papillon Stores, Inc., was its tenant.

### C.

Brown argues for the first time on appeal that M Street Five failed to provide a notice to quit in accordance with D.C.Code § 42–3505.01(a) (2001), which requires that all notices to vacate (or quit) must contain a statement detailing the reasons for the eviction. The notice to quit provided by M Street Five on June 15, 2010, to Brown stated that the lease would terminate in ninety days, "in accordance with Paragraph 2 of the Lease Modification Agreement dated November 10, 2008." [16] How-

---

was not estopped from relying on this fact under the doctrine of corporation by estoppel, it is irrelevant whether M Street Five had knowledge of Papillon's corporate revocation. In his brief and reply brief, appellant alludes to the possibility that M Street Five waived its argument about Papillon's lapsed corporate status because it was aware of the revocation but continued to accept rent from Brown. We have recognized that "[w]here there is no objection from the landlord over a substantial period of time to a known condition, the landlord is not permitted to obtain a forcible ousting of the [t]enant...." *Entrepreneur, Ltd. v. Yasuna*, 498 A.2d 1151, 1161 (D.C.1985) (citation and internal quotation marks omitted). However, in *Entrepreneur*, the landlord argued that the tenant forfeited a lease by violating a covenant therein. That is, the lease itself was valid but when the tenant violated a provision of the lease, the landlord ignored the violation for a significant period of time until it used the violation as a pretext to void the lease. In *Entrepreneur*, we concluded that the contract was still enforceable. *Id.* at 1164. Unlike *Entrepreneur*, however, this case presents an issue of whether Papil-

lon had the capacity to execute a valid contract, not whether Papillon violated a provision of the lease. As discussed at length above, Maryland law establishes that because Papillon's corporate status had lapsed, it was a legal non-entity with no power to contract. This legal issue is not subject to waiver by M Street Five. If the parties had intended, as Brown suggests, that Brown was to assume the rights and obligations arising under the Second Extension Agreement, they should have re-executed the contract to specify that Brown, not "Papillon Stores, Inc.," was the tenant.

16. The lease modification agreement dated November 10, 2008, was not admitted at trial. The November 10, 2008, lease modification agreement, was however, incorporated by reference into both the April 13, 2009, lease modification agreement and in the March 1, 2010, lease modification agreement. In addition to the first notice, M Street Five then sent Papillon a 30–Day Notice to Quit, which explained that the Lease was "terminated by the Landlord's Notice of Termination dated June 15, 2010."

ever, M Street Five argued at trial that its basis for terminating the tenancy was that Papillon was not a valid corporation and Alex Brown had no legal right to occupy the premises.[17] Accordingly, Brown claims that by predicating the notice to quit on a reason different from that which it relied upon at trial, M Street Five prevented appellant from preparing for trial, which undermined the purpose of the notice requirement in D.C.Code § 42–3505.01(a) (2001). In light of our conclusion, *supra* at section II(A), that the Second Extension Agreement was void ab initio, the notice requirements in D.C.Code § 42–3505.01(a) are inapplicable here.

Because Brown executed the Second Extension Agreement with knowledge of Papillon's revoked corporate status, the lease was void ab initio and, therefore, he was a tenant at sufferance. *See Diamond Hous. Corp. v. Robinson,* 257 A.2d 492, 495 (D.C.1969) (explaining that due to the court's finding that housing code violations rendered the lease "void and unenforceable," tenant became a tenant at sufferance and "the tenancy, like any other tenancy at sufferance, may be terminated on thirty

days' notice."); *Cevern, Inc. v. Ferbish,* 666 A.2d 17, 29 (D.C.1995) (noting that where housing violations render a lease void, the tenancy is converted to a tenancy by sufferance). Notices to quit in a tenancy at sufferance are governed by D.C.Code § 42–3204 (2001),[18] not D.C.Code § 42–3505.01(a). Unlike the tenancies arising under valid lease agreements that are subject to § 42–3505.01(a), § 42–3204 does not require that the notice to quit contain a statement detailing the reasons for eviction. Consequently, "[appellant's] tenancy, like any other tenancy at sufferance, may be terminated on thirty days' notice." *Diamond Hous. Corp., supra,* 257 A.2d at 495. Thus, Brown's notice argument is without merit.

### D.

Lastly, Brown argues that the trial court erred by awarding attorney's fees to M Street Five pursuant to the attorney's fees provision adopted by the Second Extension Agreement, that the trial court deemed to be void.[19] The trial judge awarded attorney's fees pursuant to D.C.Code § 29–

---

**17.** The record suggests that M Street Five first raised the corporation as a legal non-entity argument in its Motion for Summary Judgment, which was filed on November 15, 2010. The trial judge held a hearing on the motion during which both sides presented the merits of their arguments. The court denied the motion. Appellant did not raise the statutory notice issue during the hearing on M Street Five's Motion for Summary Judgment, at trial, or in its Motion to Amend Judgment. Appellee argues that Brown has therefore waived this argument. We need not determine whether appellant has properly preserved this issue for appeal because, as we will discuss below, our conclusion that the Second Extension Agreement was void ab initio renders the argument moot.

**18.** D.C.Code § 42–3204 states:
A tenancy by sufferance may be terminated at any time by a notice in writing from the

landlord to the tenant to quit the premises leased, or by such notice from the tenant to the landlord of his intention to quit on the 30th day after the day of the service of the notice. If such notice expires before any periodic installment of rent falls due, according to the terms of the tenancy, the landlord shall be entitled to a proportionate part of such installment to the date fixed for quitting the premises.

**19.** The trial judge found that Paragraph 5 of the Second Extension Agreement adopted the attorney's fees provision of the original 1995 Lease by stating that: "[e]xcept as otherwise herein provided, all of the terms, covenants, conditions and agreements of the original Lease, and as amended by this Lease Extension, shall be equally applicable to such extended Lease Term which is called for in this Lease Extension."

101.139 (2001) (repealed 2011), which establishes that individuals are personally liable for all debts and obligations created by acting on behalf of a corporation without authority to do so.[20] Specifically, the trial judge found that this statute prevented Brown from using Papillon's lapsed corporate status to avoid the contractual obligations created by the Second Extension Agreement, even if the contract was deemed void ab initio. Consequently, the issue before us is whether the trial court properly determined that D.C.Code § 29–101.139 (2001) (repealed 2011) enabled it to award attorney's fees pursuant to a provision incorporated by the Second Extension Agreement, despite finding that the Second Extension Agreement was void ab initio.

"Generally, under the 'American Rule' each party is responsible for paying its respective fees for legal services." *Assidon v. Abboushi*, 16 A.3d 939, 942 (D.C. 2011) (citing *6921 Georgia Ave., N.W., Ltd. P'ship v. Universal Cmty. Dev., LLC*, 954 A.2d 967, 971 (D.C.2008); *see also Travelers Cas. & Sur. Co. of Am. v. Pac. Gas & Elec. Co.*, 549 U.S. 443, 448, 127 S.Ct. 1199, 167 L.Ed.2d 178 (2007)) ("Under the American Rule, the prevailing litigant is ordinarily not entitled to collect a reasonable attorneys' fee from the loser.") (citations and internal quotation marks omitted). "However, this rule 'is subject to exception premised upon statutory authority, contractual agreement, or certain narrowly defined common law exceptions.'"

*Assidon, supra*, 16 A.3d at 942 (footnotes and citation omitted); *see also Travelers, supra*, 549 U.S. at 448, 127 S.Ct. 1199 (stating that the American Rule can be "overcome by an *enforceable* contract allocating attorney's fees.") (emphasis added) (citation and internal quotation marks omitted). "Although a trial court's decision to grant or deny a request for fees and costs is generally reviewed for abuse of discretion ... the issue of whether a trial court possesses the statutory authority to award particular fees and costs is reviewed *de novo*." *In re Estate of Green*, 896 A.2d 250, 252 (D.C.2006) (internal citations omitted). Accordingly, we review *de novo* the issue of whether D.C.Code § 29–101.139 allows for the award of attorney's fees in this case.

Section 29–101.139, which is entitled "[u]nauthorized assumption of corporate powers," is not a fee-shifting statute. Rather, it provides that "[a]ll persons who assume to act as a corporation without authority so to do shall be jointly and severally liable for all debts and liabilities incurred or arising as a result thereof." D.C.Code § 29–101.139 (2001). "[T]he words of the statute should be construed according to their ordinary sense and with the meaning commonly attributed to them." *District of Columbia v. Gallagher*, 734 A.2d 1087, 1090 (D.C.1999) (citing *Peoples Drug Stores, Inc. v. District of Columbia*, 470 A.2d 751, 753 (D.C.1983) (en banc)). That is, "if the statute is clear and

---

20. As discussed in footnote 6, subsequent to the trial judge's ruling in this case, this provision was repealed by the Business Organizations Enactment Act of 2009, which became effective on July 2, 2011. The most similar provision in the Business Organizations Enactment Act is now entitled "Liability for preincorporation transactions" and provides: "All persons purporting to act as or on behalf of a corporation, knowing there was no incorporation under this chapter, shall be jointly

and severally liable for all liabilities created while so acting." D.C.Code § 29–302.04. Although this language is similar to D.C.Code § 29–101.139, the title of this provision suggests that its application may be limited to actions taken *before* incorporation, not after a corporation forfeits its charter, as in the case before us. Accordingly, our ruling herein is limited to acts that fall within D.C.Code § 29–101.139 (2001), i.e., those acts which occurred prior to its repeal on July 2, 2011.

unambiguous on its face, the motivation of the legislature that enacted it, or of individual legislators, is of no concern to a court that is called upon to enforce it." *Burgess v. United States,* 681 A.2d 1090, 1095 (D.C.1996). Brown does not contend that the trial judge misinterpreted the meaning of the statute or that the meaning thereof was not clear and unambiguous on its face. Indeed, Brown does not even acknowledge that the trial judge relied on the statute. We do not find the language of § 29–101.139 ambiguous, and thus we review the applicability of this statute by looking to its plain meaning. Therefore, to find Brown liable for M Street Five's attorney's fees pursuant to § 29–101.139, each of the following three elements, which we glean from the plain language of the statute, must be fulfilled: (1) Brown "assume[d] to act as a corporation"; (2) "without authority so to do"; and (3) the attorney's fees are "debts [or] liabilities incurred or arising as a result thereof." D.C.Code § 29–101.139 (2001) (repealed 2011).

Brown's conduct easily fulfills the first and second elements of § 29–101.139. First, he "assumed to act as a corporation" by executing the Second Extension Agreement and subsequent lease modifications on behalf of "Papillon Stores, Inc." As we noted above, Brown did not act in his individual capacity when he signed the contracts. Second, Brown did not have "authority so to do" because Papillon's corporate status had lapsed and it was therefore a legal non-entity. That is, due to Papillon's revoked corporate status, no one had authority to act on behalf of Papillon. However, whether the third and final element of § 29–101.139 has been met is more complex in light of our conclusion,

and more importantly, M Street Five's own argument that the Second Extension Agreement was void ab initio.[21] That is, to fulfill the third element, we must find that the attorney's fees provision of the Second Extension Agreement can still be classified as a "debt or liability" arising as a result of Brown purporting to act as Papillon, despite our holding that the contract was void ab initio.

■ For the following reasons, we find that while our conclusion that the Second Extension Agreement was void ab initio does not, *per se,* preclude M Street Five from claiming attorney's fees pursuant to § 29–101.139, M Street Five's *own* argument that the lease was void ab initio judicially and equitably estops it from seeking this relief. We first address why enforcement of the attorney's fees provision is not necessarily precluded by our conclusion that the Second Extension Agreement is void.

In *Robertson v. Levy,* we held that "[a]n individual who incurs statutory liability on an obligation under section 29–950 [which was recodified as D.C.Code § 29–101.139 (2001)] because he has acted without authority, is not relieved of that liability where, at a later time, the corporation does come into existence...." 197 A.2d 443, 447 (D.C.1964). In particular, we determined that Levy, who signed a contract on behalf of a corporation that had yet to come into existence, could not later use the corporation's nonexistence as a defense when Robertson attempted to enforce the terms of the contract. *Id.* Thus, *Robertson* establishes that under § 29–101.139, a party can enforce the terms of a contract executed by a person acting as a corpora-

---

**21.** Paragraph 5 of the Second Extension Agreement stated: "Except as otherwise herein provided, all of the terms, covenants, conditions, and agreements of the original Lease, as amended by this Lease Extension, shall be equally applicable to such extended Lease Term which is called for in this Lease Extension."

tion without authority to do so. That is, in some cases, the conclusion that a contract is void ab initio does not absolve the party who executed the contract on behalf of the nonexistent corporation of the obligations arising thereunder. Yet, our holding is not limited to this conclusion because the case before us is factually distinguishable from *Robertson*. Unlike the plaintiff in *Robertson*, M Street Five did not seek to enforce the contract. Rather, it argued in its Motion for Summary Judgment and at trial that the Second Extension Agreement was void ab initio, then later argued that the attorney's fees provision should remain in force.

The trial court did not consider the implications of this inherent inconsistency of M Street Five's argument. In its Memorandum and Order Granting Plaintiff's Motion for Reconsideration of Denial of Motion for Award of Attorney's Fees, the trial court found support for its decision to hold Brown liable for the attorney's fees provision incorporated by the Second Extension Agreement in *American Vending Services, Inc. v. Morse*, 881 P.2d 917 (Utah Ct.App. 1994). In *American Vending Services*, the plaintiffs brought an action to enforce the contract against the defendants in their individual capacities because the defendants entered into a contract on behalf of a non-existent corporation. 881 P.2d at 919. As in the case before us, the contract at issue in *American Vending Services* included a clause providing for the payment of costs and attorney fees to the non-breaching party in the event of a default. *Id.* at 927. Although the contract was entered by the plaintiffs and the non-existent corporation, the Utah Court of Appeals found the defendants personally liable for attorney fees pursuant to UTAH CODE ANN. § 16–10–139 (1991), a provision of the Utah Code that was identical to D.C.Code § 29–101.139. *Id.* Importantly, the court recognized that "Utah adheres to

the rule that 'a provision for payment of attorney's fees in a contract includes attorney's fees incurred by the prevailing party on appeal as well as at trial, *if the action is brought to enforce the contract.*'" *Id.* at 927 (quoting *Mgmt. Servs. Corp. v. Dev. Assocs.*, 617 P.2d 406, 409 (Utah 1980)) (emphasis added). Thus, unlike M Street Five who ultimately argued that Brown had no right to remain on the premises because the Second Extension Agreement was void, the plaintiffs in *American Vending Services* sought to enforce the obligations created by the contract. The trial court also cited to *Thompson & Green Mach. Co. v. Music City Lumber Co.*, which applied Tennessee's statutory equivalent of D.C.Code § 29–101.139, to find an individual liable for attorney's fees because the individual signed a promissory note on behalf of a nonexistent corporation that included a provision for attorney's fees. 683 S.W.2d 340, 345 (Tenn.Ct.App.1984). Yet, as in *Robertson* and *American Vending Services*, the plaintiff in *Thompson* also sought to *enforce* the terms of the underlying contract. *Thompson, supra*, 683 S.W.2d at 342.

We find the Ninth Circuit's analysis in *Golden Pisces, Inc. v. Fred Wahl Marine Constr., Inc.*, 495 F.3d 1078 (9th Cir.2007) to be more analogous and more persuasive than the cases relied upon by the trial judge. In *Golden Pisces*, a shipowner who prevailed in a breach of contract action by showing that the underlying contract was void sought to enforce an attorney's fees provision from the void contract. 495 F.3d at 1081. After analyzing nearly a dozen state and federal cases, the Ninth Circuit determined that "[t]he principle that emerges from our survey of federal and state case law is that, consistent with the American Rule, a party who prevails by demonstrating that a contract is entirely void, as opposed to divisible, voidable, or

rescindable, cannot then seek the benefit of an attorneys' fees provision from that contract." *Id.* at 1083.

In evaluating whether § 29–101.139 provides relief for M Street Five, we are troubled by M Street Five's attempt to enforce a discrete provision of a contract that M Street Five *itself* argued was void ab initio; by doing so, M Street Five is essentially attempting to "have its cake and eat it too." M Street Five filed a complaint in the Landlord and Tenant Division seeking possession of the property because Brown did not comply with its Notice of Termination. When Brown responded that he had exercised his option to extend the lease for five more years and began to litigate accordingly, M Street Five fundamentally altered its argument. Namely, in its Motion for Summary Judgment, M Street Five argued that because Papillon was a nonexistent corporation, the lease was void ab initio and Brown had no contractual right to remain on the property. Yet, while M Street Five insists that the option to extend was void because the Second Extension Agreement itself was void, M Street Five nevertheless argues that the provision creating Papillon's obligation to pay attorney's fees remains enforceable.

We conclude that the doctrines of judicial estoppel and equitable estoppel preclude enforcement of the attorney's fees provision in the Second Extension Agreement pursuant to § 29–101.139. Under the doctrine of judicial estoppel, "[i]f a party has taken a position before a court of law, whether in a pleading, in a deposition, or in testimony, judicial estoppel may be invoked to bar that party, in a later proceeding, from contradicting his earlier position." Rand G. Boyers, Comment, *Precluding Inconsistent Statements: The Doctrine of Judicial Estoppel,* 80 Nw. U.L.Rev. 1244, 1244–45 (1986).

"The independent doctrine of judicial estoppel precludes a litigant from playing fast and loose with a court of justice by changing his position according to the vicissitudes of self-interest[.]" *Porter Novelli, Inc. v. Bender,* 817 A.2d 185, 188 (D.C.2003) (quoting *Lofchie v. Washington Square Ltd. P'ship,* 580 A.2d 665, 668 (D.C.1990)) (Schwelb, J., concurring). In *Porter Novelli,* we addressed another landlord-tenant dispute, finding that "[b]ecause subtenant switched legal positions in two related judicial proceedings, taking one side of an issue at trial and saying the opposite on appeal, the technical doctrine we apply is 'judicial estoppel.'" 817 A.2d at 188. Similarly, in *Golden Pisces,* the Ninth Circuit determined that the doctrine of judicial estoppel, "which precludes a party from gaining an advantage by taking contradictory positions at different stages of a judicial proceeding," applied to the shipowner's attempt to claim attorney's fees because the shipowner "first argued to [its] advantage that the written contract was void ... and now seek[s], again to [its] advantage, to enforce a term from that same contract." 495 F.3d at 1084 (internal quotation marks omitted). Also, the Supreme Court of the State of New York, Appellate Division, addressed an inverse, but analogous, factual scenario in *Nestor v. Britt,* 270 A.D.2d 192, 707 N.Y.S.2d 11 (N.Y.App.Div.2000). *Nestor* held that, under the doctrine of judicial estoppel, having employed a lease as the "exclusive contractual predicate for the relief sought in their petition ... petitioners may not now, based on a reversal of their legal fortunes, seek to invalidate provisions of that lease...." *Id.* at 193, 707 N.Y.S.2d 11.

In turn, under the "broader doctrine of 'equitable estoppel,'" a "'party with full knowledge of the facts, which accepts the

benefits of a transaction, contract, statute, regulations *or order* may not subsequently take an inconsistent position to avoid the corresponding obligations or effects.'" *Porter Novelli, supra,* 817 A.2d at 188 (emphasis in original) (quoting *Thoubboron v. Ford Motor Co.,* 809 A.2d 1204, 1212 (D.C.2002)). In *Porter Novelli,* we held that equitable estoppel applied in addition to judicial estoppel to bar a subtenant's attack against an order requiring it to pay triple rent because the subtenant had previously acknowledged to the court that it was obliged to pay triple rent if the court ordered a stay of immediate eviction. 817 A.2d at 188.

Here, M Street Five's claim that the Second Extension Agreement is void ab initio directly contradicts its subsequent claim that it is entitled to attorney's fees pursuant to the Second Extension Agreement. As addressed in Section II(A) above, we recognize that § 29–101.139 is intended to serve a punitive purpose, but find that Brown has already been penalized by being denied any contractual right to the property. *Accurate Constr. Co., supra,* 378 A.2d at 684–85. As in the factually analogous Ninth Circuit case, *Golden Pisces,* having first argued in its motion for summary judgment and at trial that the contract is void, M Street Five is judicially estopped now from seeking to its advantage, to enforce a term from the same contract. 495 F.3d at 1084. Further, having accepted the benefits of the trial court's order that the Second Extension Agreement was void ab initio, M Street Five is equitably estopped from asserting the inconsistent position that Brown is still liable for the obligations arising thereunder. Accordingly, we find that while § 29–101.139 does provide relief to parties seeking to enforce contracts against those who executed the contract while assuming to act as corporations without authority to do so, M Street Five is

judicially and equitably estopped from seeking such statutory relief, and thus, no exception to the American Rule is appropriate here.

### III.

For the foregoing reasons, we affirm the trial court's judgment granting possession of the property to M Street Five but reverse the judgment awarding attorney's fees to M Street Five and remand for further proceedings consistent with this opinion.

*So ordered.*